IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SCOTT B. ATWOOD,<br><br>                    Plaintiff,<br><br><br>vs.<br><br><br>SWIRE COCA-COLA, USA, and THE SWIRE COCA-COLA, USA LONG-TERM DISABILITY PLAN,<br><br>                    Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:03-CV-1014 TC |

Plaintiff Scott B. Atwood is seeking equitable relief under the Employee Retirement Income Security Act of 1974 (ERISA) regarding long term disability benefits offered by his former employer, Swire Coca-Cola, USA (Swire), and the Swire Coca-Cola, USA Long-Term Disability Plan (the Plan). This dispute arose after Mr. Atwood's application for long term disability benefits was denied because he was not enrolled in the Plan.

Mr. Atwood asserts that he requested coverage on the date he was hired but that Swire breached its fiduciary duty by failing to timely and properly enroll him in the Plan. Mr. Atwood seeks enrollment (that is, "instatement") in the Plan as of Mr. Atwood's eligibility date (this would place him in the position he would have been in had Swire timely and properly enrolled him in the Plan when he was hired).

The Defendants contend that they did not breach any fiduciary duty. They further contend that any damages Mr. Atwood may have suffered were caused by his own negligence,

and that Mr. Atwood is seeking relief unavailable under ERISA.

The court held a trial without a jury on September 22, 2006, and now issues its Findings of Fact and Conclusions of Law.  As explained in more detail below, the court finds that Swire is ultimately responsible for the failure to enroll Mr. Atwood in the Plan.  Accordingly, the court finds that Mr. Atwood is entitled to the injunctive relief he requested, and the court enters judgment in his favor.

## FINDINGS OF FACT

Scott Atwood used to work as a full-time fleet mechanic for Swire.  Swire offered various benefits to its full-time employees, including long term disability (LTD) insurance coverage. UNUM Life Insurance Company of America (not a party to this action) was the insurer and claims administrator for the Plan.

Mr. Atwood left his job with Swire after he injured his wrist and apparently could no longer work.  He applied for long term disability benefits, but he was turned down by UNUM principally because he had never been enrolled in the Plan.  This surprised Mr. Atwood because he believed he had LTD coverage.  It soon became apparent that unfinished paperwork, a lack of follow-up, and the passage of time (including expiration of deadlines) prevented his proper and timely enrollment in the Plan, and, consequently, left him without LTD insurance coverage.

### Mr. Atwood's First Day as a Swire Employee

On August 28, 2000, Mr. Atwood's first day on the job, he filled out several forms at the request of his supervisor.  One of those forms was a two-page "Insurance Enrollment" form containing the following instructions:  "Please complete this form and both insurance cards attached to this packet.  Each of the types of insurance listed below require you to contribute to

2

the premium cost." (Insurance Enrollment Form, Pl.'s Ex. 5.) On that day, no insurance cards were attached to the form.[1] Mr. Atwood testified that if he had received insurance cards, he would have signed them.

On the first page of the form, Mr. Atwood was given the option to select from various insurance plans. When he filled out the form on August 28, 2000, he checked the box next to "Wellness Coverage," which included medical, dental, vision, prescription drugs, life, accidental death and dismemberment, and long term disability insurance. At the bottom of the page, above the employee signature line, was the following statement:

> I request that Swire arrange for the issuance of group coverage for which I will become eligible. I also authorize Swire to deduct from my salary or wages the necessary premium for the coverage requested above. I understand that I must meet all eligibility requirements including the 120 days waiting period before coverage will become effective.

(Id.) Mr. Atwood signed and dated the form.

The reverse side of the form contained alternative "Waiver of Insurance" and "Insurance Ineligibility" sections. Despite the fact that Mr. Atwood selected and signed up for insurance coverage on the first page of the form, he also signed the "Waiver of Insurance" portion of the form. But he did not check a box designating which insurance, if any, he wished to waive. Instead, he checked a box that said he was not waiving insurance coverage. He returned the completed form to his supervisor that same day.

_____

[1]Apparently, Swire did not necessarily attach the cards to the form given to the employee on his first day at work. Eligibility did not occur for 120 days, and information regarding group insurance benefits had not been fully communicated, so the payroll clerks (who were in charge of enrollment details) typically waited until employee orientation to distribute the enrollment cards. (Sept. 22, 2006 Trial Transcript at 72, 151.)

**Eligibility For Swire's LTD Benefits**

To receive long term disability benefits, a Swire employee had to satisfy certain eligibility requirements.  An employee was eligible if he worked continuously as a full-time Swire employee for more than 120 days.  Mr. Atwood was a "full-time employee" (one who works more than thirty hours per week).  The first day that LTD benefits were available to him (his "eligibility date") was approximately December 26, 2000.  Nothing further was required to establish eligibility as long as the employee enrolled in the Plan no later than thirty-one days after his eligibility date (approximately January 26, 2001, in Mr. Atwood's case).  Otherwise, UNUM required evidence of insurability before enrollment in the Plan would be approved (that is, enrollment was no longer automatic and coverage was not guaranteed).  (See Plan at 7.)

The employee had to pay part of the premium for LTD benefits.  Payment of a premium was accomplished through a deduction from the employee's wages by Swire, who then forwarded the premium to UNUM.

**The New Employee Orientation Meeting**

On October 24, 2000, Mr. Atwood attended a new employee orientation meeting.[2]  At that meeting, he received a copy of the Swire Employee Manual (Def.'s Ex. G), which contained a wide variety of information about Swire's policies and rules.  Documents in the Employee Manual described group insurance benefits, including LTD benefits.  The Manual contained a vague summary of group insurance programs.  (See Employee Handbook, contained in Employee

---

[2]Swire periodically held orientation meetings for groups of new employees whose 120-day waiting period had not yet expired.

Manual, at 5.)  It also contained a summary brochure entitled "2000 Benefits."[3]  And, finally, it contained a more detailed document describing the Plan.  That document provides that the employee must "enroll for insurance with [UNUM] <u>through [his] employer</u> on a <u>form satisfactory to [UNUM]</u>."  (Plan, contained in Employee Manual, at 7 (emphasis added).)  It does not indicate that an enrollment card is necessary for proper enrollment in the Plan.[4]

Two employees from Swire's payroll department, Jantz Perry and Tiffany Hollands, conducted the orientation meeting.  Swire's payroll department was in charge of distributing, collecting, reviewing, and processing benefit applications.  At the end of the process, Swire sent a list of new enrollees and their premiums to UNUM.

Attendees were required to sign in at the beginning of the meeting.  According to Ms. Perry, she and Ms. Hollands gave the attendees three insurance enrollment forms, including an LTD enrollment card and the Insurance Enrollment form filled out on the date of hire.  Ms. Perry and Ms. Hollands narrated an electronic slide presentation that covered a broad variety of topics, such as Swire's history and operations, employee benefits, and safety policies and procedures. The attendees were told that all forms, including the enrollment cards, needed to be filled out to

---

[3]The "2000 Benefits" summary incorrectly described eligibility requirements for Long Term Disability Insurance.  It said that an employee must enroll within thirty-one days of his hire date to remain eligible.  But the correct eligibility requirement was that an employee must enroll within thirty-one days of the end of the 120-day waiting period (also known as the "eligibility date").  (<u>Compare</u> "2000 Benefits" summary in Employee Manual <u>with</u> governing Plan in Employee Manual at p.7.)

[4]Also admitted into evidence was a different version of the Plan document.  (<u>See</u> Plan Document dated January 1, 2000, Pl.'s Ex. 2.)  Although the language in Plaintiff's Exhibit 2 is somewhat different than Plan document language contained in the Employee Manual, there appears to be no material difference between the two.  The court relies on the Plan document in the Employee Manual because that is, apparently, the document actually distributed to Mr. Atwood on October 24, 2000.

receive coverage.  Near the end of the presentation, Ms. Perry and Ms. Hollands emphasized that each employee was expected to read and understand the contents of the Employee Manual distributed at the meeting.  Each attendee, including Mr. Atwood, was required to sign a form acknowledging receipt of the Employee Handbook.  (See Pl.'s Ex. 10.)  Through the acknowledgment form, Mr. Atwood stated that "I will familiarize myself with all rules and regulations in this Handbook . . . ."  (Id.)

At the meeting, Mr. Atwood received the Insurance Enrollment form that he completed in August 2000, but he did not recall receiving any enrollment cards with it.  He said he would have signed any card that he received.  Ms. Perry, on the other hand, testified that she and Ms. Hollands passed out enrollment cards, including the UNUM LTD enrollment card, to all attendees.  She did not testify regarding Mr. Atwood in particular.  And although her testimony related to the October 24, 2000 meeting, her testimony was general and related to the group of attendees as a whole.

During the meeting, Mr. Atwood asked one of the presenters how to select coverage that did not include health insurance (his wife already had health insurance through her employer and he did not want to duplicate or pay more premiums than necessary) while retaining other coverage, including long term disability insurance.  He was told to check and sign the Waiver of Insurance.  He also was told that he had incorrectly signed his name under "Insurance Ineligibility," and so he crossed out his signature and the "10/24/00" date.  Mr. Atwood testified that he returned the Insurance Enrollment form to one of the Swire employees before he left the meeting, believing that he had filled out everything he needed to fill out.  If he had returned a completed LTD enrollment card, he would have been enrolled in the Plan with automatic

6

coverage from UNUM.  But no card was filled out at that time, and so Mr. Atwood did not

receive the anticipated automatic coverage on December 26, 2000.  But he did not know that he

was not covered.

**Mr. Atwood's May 2, 2001 Wrist Injury**

On May 2, 2001, Mr. Atwood saw a doctor for pain in his right wrist.  The doctor told

Mr. Atwood that he needed surgery on the wrist for a recent scaphoid fracture.

**May 4, 2001 Discovery That Mr. Atwood Was Not Enrolled In the Plan**

Two days after his injury, on May 4, 2001, Mr. Atwood and his wife met with Swire's

Benefits Administrator, Ronald Lewis.  The initial purpose of the meeting was to discuss short

term disability benefits in connection with Mr. Atwood's anticipated wrist surgery.  But the topic

eventually turned to Mr. Atwood's overall benefit package.  Mr. Lewis retrieved the Insurance

Enrollment form that Mr. Atwood had initially completed on August 28, 2000, and later

modified on October 24, 2000.  Mr. Atwood told Mr. Lewis that he preferred the benefit package

with no health insurance coverage because his family was already covered for medical expenses

through his wife's employee benefits.  Based on that discussion between the Atwoods and Mr.

Lewis, and at Mr. Lewis's direction, Mr. Atwood crossed out the "Wellness Coverage" selection

on his Insurance Enrollment form and wrote his initials above that.  Then he wrote an "x" in the

"Partial Coverage" box, and initialed and dated his election "5/4/01."  (See Pl.'s Ex. 5.)  "Partial

Coverage" included life, accidental death and dismemberment, and long term disability

insurance, just as "Wellness Coverage" had, but it did not include medical, dental, vision, or

prescription drug benefits.

As Mr. Lewis reviewed Mr. Atwood's file during the meeting, he noticed that the file did

not contain an enrollment card for long term disability benefits.  Accordingly, he determined that Mr. Atwood had never been enrolled in the Plan.

He made this determination because normally Swire kept the employee's enrollment card in the file to document enrollment.  Enrollment cards were not sent to UNUM.  Instead, Swire sent a monthly "omnibus report" to UNUM containing a list of people added to and removed from the Plan and a lump payment of that month's premium (taken from the employees' wages). (Sept. 22, 2006 Trial Transcript ("Tr.") at 75.)  Indeed, the insurance policy issued by UNUM provides that "[t]he policyholder [Swire] must provide UNUM with the following on a regular basis . . . information about employees who are eligible to become insured; whose amounts of coverage change; and/or whose coverage ends."  (UNUM Group Insurance Policy, Pl.'s Ex. 3.) The employee did not have the ability to enroll in the Plan; it was Swire's responsibility to enroll the employee in the Plan and communicate a list of new enrollees to UNUM.

At Mr. Lewis's direction, Mr. Atwood completed the enrollment card.  Then Mr. Lewis added a note to the Insurance Enrollment form: "5/4/01 Employee came in and signed insurance paperwork.  Not added in error."  (Pl.'s Ex. 5.)  Mr. Lewis initialed the note.  During testimony, Mr. Lewis clarified that he meant that Mr. Atwood was not added to the Plan and it appeared that he should have been added based on Mr. Atwood's election of coverage on August 28, 2000. (See Tr. at 85, 102.)  Mr. Lewis also believed that the paperwork completed during the May 4, 2001 meeting was sufficient to enroll Mr. Atwood in the Plan.  He said he was not aware that Mr. Atwood had to complete a separate Evidence of Insurability form.  (Id. at 89.)  Mr. Atwood did not receive an Evidence of Insurability form, and no such form was sent to UNUM.

Apart from his meeting with Mr. Lewis, Mr. Atwood did not receive any communication

from any Swire employee regarding his election of and application for LTD coverage, much less any communication that his form was incomplete.

**Swire's Obligation To Review and Follow-Up On Confusing or Incomplete Forms**

The Insurance Enrollment form, as completed by Mr. Atwood on August 28, 2000, was confusing.  He elected insurance coverage by marking the "Wellness Coverage" box and signing the first page of the form.  At the same time, he signed the portion of the form that waived coverage.  That inconsistency alone should have raised a question.  But the damage was not done then, because Swire only needed the employee to fill out his name on the form at the time of hire.  Swire expected that the form would be completed after employee orientation and before the 120-day waiting period was over.

The Insurance Enrollment form that Mr. Atwood submitted on October 24, 2001, was equally confusing.  Mr. Atwood's crossed-out signature in the Insurance Eligibility section of the form certainly did not add clarity.  Also, the form was incomplete by Swire's own standards, because it was not accompanied by an LTD enrollment card.  The lack of an insurance card does not, in this case, indicate that Mr. Atwood was not interested in signing up and paying for long term disability benefits.  Instead, the Insurance Enrollment form arguably indicated (despite his signature in the waiver section) that Mr. Atwood had elected long term disability coverage.

Witnesses from Swire described their usual practice of following up regarding confusing or incomplete forms.  Ron Lewis, a former Benefits Administrator for Swire, noted that when employees did not return the relevant forms to him at the end of the orientation meetings he conducted, he would "attempt to contact that employee and to follow up and see if – you know, reminding them that I needed the form to enroll them."  (Tr. at 73.)   He said there were times

9

when forms returned to him were confusing, contradictory, or ambiguous.  At that point, he would try to contact the employee.  "Sometimes I would – if they were missing a form, I would put it in an interoffice envelope with a note saying, 'Please complete and return to me.'" (Id. at 74.)  He said that he would attempt to follow up probably two or three times after that.

Susanne Millias, Swire's Payroll Manager in October 2000 (when Mr. Atwood attended the new employee orientation meeting and submitted the incomplete Insurance Enrollment form), testified regarding the Swire payroll department's practice with respect to incomplete forms:

> Usually the payroll clerk would call the supervisor and . . . if [the employee] had filled out the election form saying [he] wanted something, [the payroll clerk] would call [the employee] and say that they are missing this or that they need to come in and sign this.  But usually we contacted the supervisor or the employee and tried to get them to fill out the additional paperwork if it was missing.

(Tr. at 164.)  She also testified that it was the payroll clerk's obligation to review enrollment documents for completeness, contradictory statements, and confusing information.  She further elaborated that, as part of department policy, the payroll clerk typically did keep a record of efforts to follow up with the employee, but no such record existed for Mr. Atwood.

Other than Mr. Atwood's May 4, 2001 conversation with Ron Lewis, Mr. Atwood was never contacted by anyone regarding his confusing and incomplete Insurance Enrollment form.

**Mr. Atwood's Payment of Premiums**

On August 28, 2000, when Mr. Atwood signed the Insurance Enrollment form, he authorized Swire to deduct insurance premiums from his paychecks.  But because the payroll department did not have an insurance enrollment card for him when he became eligible for coverage (around December 26, 2000), it did not initially deduct premiums from Mr. Atwood's paycheck.  Consequently, UNUM did not receive a premium from Mr. Atwood for January 2001

10

to May 2001.  It was only after Mr. Atwood met with Ron Lewis and completed the LTD card

that premiums were deducted by the payroll department.[5]  Swire then forwarded those premiums

to UNUM.  The total amount of premiums deducted from Mr. Atwood's paycheck (for the period

of June 2001 to approximately September 2003) was less than fifty dollars.

      After UNUM denied Mr. Atwood's claim for disability, stating that he had never been

insured, UNUM offered to return Mr. Atwood's premium payments (a nominal sum).  Mr.

Atwood rejected the offer.

**Mr. Atwood's Long Term Disability**

      In May 2003, Mr. Atwood again experienced pain in his wrist, and on May 22, 2003, he

had a second surgery.  After the surgery, he was unable to return to work.  He exhausted his short

term disability benefits and other short-term leave available to him, so he filed an LTD claim

with UNUM on August 20, 2003.  On September 22, 2003, Swire terminated Mr. Atwood's

employment.

**UNUM's Denial of LTD Coverage**

      UNUM denied Mr. Atwood's application for LTD benefits.  According to UNUM, Mr.

Atwood was never enrolled in the Plan so he never had LTD insurance.  Specifically, he was not

enrolled in the Plan because he requested enrollment more than 151 days after his date of hire

and he never submitted the required Evidence of Insurability form.  This was UNUM's first, and

---

[5]Swire makes much of the fact that Mr. Atwood never noticed that premiums were not
deducted from his bi-weekly paycheck.  But the court does not place much weight on that.  The
court disagrees with any suggestion that Mr. Atwood's failure to review every detail of his direct
deposit earnings statement from his new employer is sufficient, by itself or in combination with
other events in the record, to relieve Swire of responsibility for failing to follow through on Mr.
Atwood's initial election of insurance coverage.

initial, reason for denying Mr. Atwood's LTD application.  (See Sept. 26, 2003 Ltr. from Keith

Owensby, UNUM, to Scott Atwood, Pl.'s Ex. 25.)

When Ron Lewis, in a telephone call to UNUM, suggested that Mr. Atwood should be

covered beginning on his eligibility date, UNUM's representative, Keith Owensby, disagreed

with Mr. Lewis's suggestion of retroactivity, noting that Mr. Atwood did not sign the enrollment

card until May 4, 2001, and did not pay premiums before June 2001.  In a note regarding that

telephone call, Mr. Owensby stated:

> Lewis stated that [employee] accepted company benefits in 8/2000.  I stated that if
> this had been a company paid benefit that EDOC [presumably coverage date]
> could be end of [waiting period] but it was a contrib[ution] plan paid by the
> [employee.].

(UNUM Claim Document #2079467, Pl.'s Ex. 26.)

Later, in an October 20, 2003 letter to Mr. Atwood's attorney, UNUM gave a second

reason for denial of Mr. Atwood's application.  Mr. Owensby stated that even if Mr. Atwood had

submitted an Evidence of Insurability form, the application for coverage would not have been

approved because Mr. Atwood's May 2003 disability arose out of the May 2, 2001 wrist injury,

which occurred two days before Mr. Atwood signed the enrollment card.  (See Oct. 20, 2003 Ltr.

from Keith Owensby, UNUM, to Marcie E. Schaap, Def.'s Ex. H.)

## CONCLUSIONS OF LAW

Mr. Atwood brings his action for breach of fiduciary duties under ERISA § 502(a)(3)(B),

which provides that "[a] civil action may be brought [under ERISA] by a participant . . . to obtain

other appropriate equitable relief (i) to redress [violations of this subchapter or terms of the plan]

or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]"[6]  29 U.S.C.

§ 1132(a)(3)(B) (emphasis added).  He seeks "other appropriate equitable relief" based on what

he characterizes as Swire's breach of its fiduciary duty to him as a participant in the Plan.[7]

To succeed on his claim, Mr. Atwood must establish that Swire was an ERISA fiduciary

that owed a duty to him, that Swire breached that duty, and that he was aggrieved by the breach.

See 29 U.S.C. §§ 1104 (setting forth duties of ERISA fiduciary), 1132 (providing civil

enforcement remedy to plan participants).

**Swire was an ERISA fiduciary for the Plan.**

ERISA defines a "fiduciary" as anyone exercising "any discretionary authority or

discretionary control respecting management of [an employee welfare benefit] plan" or anyone

with "discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C. § 1002(21)(A).  This is a broad, functional definition.  See Mertens v. Hewitt Assocs.,

508 U.S. 248, 262 (1993) (noting that ERISA defines "fiduciary" "in functional terms of control

and authority over the plan, see 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons

---

[6]Mr. Atwood may not rely on ERISA § 409, 29 U.S.C. § 1109, titled "Liability for breach of duty."  This provision provides relief for a plan, not individual participants.  Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140-44 (1985).

[7]Mr. Atwood properly seeks "other appropriate equitable relief" because the remedy under an alternative civil enforcement section, ERISA § 502(a)(1)(B), is not available to Mr. Atwood.  Section 502(a)(1)(B) allows a participant to "recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).  This section is not applicable because Mr. Atwood was never enrolled in the Plan.  Rather, Mr. Atwood is seeking the opportunity to apply for benefits.  See, e.g., Varity Corp. v. Howe, 516 U.S. 489, 515 (1996) (holding that plaintiffs who were no longer members of plan could not rely on § 502(a)(1)(B) and so had to rely on § 502(a)(3) to have a remedy); Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 385 (4th Cir. 2001) (holding that plaintiff who could not receive benefits due under the plan was required to seek relief under § 502(a)(3)).

subject to fiduciary duties . . . .").

The court finds that Swire was a fiduciary, as defined in 29 U.S.C. § 1002(21)(A).  First, there is no dispute that at the relevant times Swire was the Plan Administrator for the Plan.  Nor is there dispute that the Plan is an employee welfare benefit plan governed by ERISA.  See 29 U.S.C. §§  1002(1) (defining "employee welfare benefit plan"), 1002(16) (defining plan administrator).  Second, as Plan Administrator, Swire accepted and performed the duties of an ERISA fiduciary.

The duties of an ERISA fiduciary are set forth in ERISA § 404(a)(1):

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a)(1)(B).  The United States Supreme Court elaborated on the duties, saying that "[f]iduciaries are assigned a number of detailed duties and responsibilities, which include 'the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.'" Mertens, 508 U.S. at 251-52 (quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142-43 (1985)).  The Court also noted, in Varity Corporation v. Howe, that "[t]here is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan."  516 U.S. 489, 504 (1996) (citing Bogert & Bogert, Law of Trust & Trustees § 551, at 41-52).  "The law of trusts [from which ERISA borrows] also understands a trust document to implicitly confer 'such powers as are necessary or

appropriate for the carrying out of the purposes' of the trust."  Id. at 502 (quoting 3 A. Scott &

W. Frachter, Law of Trusts § 186, p. 6 (4th ed. 1988).).

Swire accepted the obligation to properly administer the Plan.  As Plan Administrator,

Swire established the procedures for an employee to select coverage and for an employee to be

enrolled in a benefit plan.  Swire hired a professional Benefits Administrator and other staff to

carry out such duties.  And Mr. Atwood properly relied on Swire's administrative capacity and

expertise.  No other entity had the ability, much less the authority, to enroll participants like Mr.

Atwood.  It was Swire who had the duty to report to UNUM the names of employees who should

be added to the Plan.  Certainly Mr. Atwood had no ability to sign up for coverage directly

through UNUM.  It was Swire who had the discretionary responsibility to administer the Plan.

The court finds that Swire is a fiduciary and was acting in its fiduciary capacity when it

handled employee benefit enrollment activities.

**Swire Owe Mr. Atwood a Fiduciary Duty.**

Swire contends that, even if it was a fiduciary, it owed no fiduciary duty to Mr. Atwood

because Mr. Atwood was not a participant in the Plan due to his own failure to submit the

UNUM LTD Enrollment Card.  The court disagrees with Swire's circular reasoning.

A fiduciary owes a duty to participants and beneficiaries of the employee welfare benefit

plan.  29 U.S.C. § 1104(a)(1) (requiring fiduciary to discharge its duties in the interest of

participants and beneficiaries).  Mr. Atwood is a "participant" as that is defined in ERISA.

ERISA defines "participant" as "any employee or former employee of an employer . . . who is or

may become eligible to receive a benefit of any type from an employee benefit plan which covers

employees of such employer . . . ."  29 U.S.C. § 1002(7).  Mr. Atwood became a "participant" on

15

August 28, 2000, the day he began working for Swire.  At that point, he was an employee who had the ability to become eligible for LTD benefits.  And he claims that he would have been eligible but for the actions (or inactions) of Swire.  That is sufficient to satisfy the definition of "participant."[8]

**Swire breached its duty to competently administer the Plan and maintain Plan records.**

Swire's human resources employees (particularly Mr. Lewis and Ms. Millias) testified regarding Swire's policy and procedure for communicating benefit options to employees, obtaining documentation of each employee's benefit selection (or waiver), and enrolling employees in benefit plans, including the Plan.  They both acknowledged Swire's obligation, and their general practice, to audit employee benefit application forms to determine accuracy and completeness.  They further acknowledged that it was their practice to follow up, at least once, with any employee who had elected coverage but whose form was incomplete or incorrectly completed.

None of that happened with Mr. Atwood.  He was in an eligible employee class, and he submitted a confusing and incomplete Insurance Enrollment form that nevertheless indicated he

---

[8]To the extent Swire is contending that Mr. Atwood has no "participant" standing, the court disagrees as well.  Mr. Atwood is a participant with standing because he is a former employee with a colorable claim that he will prevail in a suit for benefits (the requirements for a colorable claim are not stringent).  See 29 U.S.C. § 1002(7) (defining participant as "former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan"); Horn v. Cendant Operations, Inc., 69 Fed. Appx. 421, pp. **3-**4 (10th Cir. July 3, 2003) (noting that former employee may become eligible for benefits, and therefore has standing, if the former employee would have been eligible but for the fiduciary's alleged breach of duty); Winkel v. Kennecott Holdings Corp., 48 F. Supp. 2d 1294 (D. Utah 1999) (finding that former employee had standing because plaintiffs in Varity Corp. v. Howe, 516 U.S. 489 (1996)—who were no longer employees, had no expectation of returning to covered employment and had no vested benefits remaining—had standing).

had selected coverage for long term disability.  There is no evidence that Swire audited Mr. Atwood's Insurance Enrollment form or contacted him at any point during the 120-day waiting period when the apparent problems could be resolved without consequence.  Even if Swire had followed through on its obligations within 151 days of Mr. Atwood's hire date (after which "evidence of insurability" was required by UNUM), the problem now facing the court could have been averted.

Mr. Atwood credibly testified that he did not receive the enrollment cards but that, if he had received them, he would have filled them out and signed them.  But even if he did receive the cards during the October 2000 orientation session, the fact that he did not complete them is not dispositive.  Swire had the duty to follow through on Mr. Atwood's incomplete form.[9]  And it did not do so.  But for Swire's breach of its fiduciary duty to Mr. Atwood, Mr. Atwood would have been enrolled in the Plan and would have had the opportunity to apply for long term disability benefits by any other eligible employee.

Instead, the problem was noticed by chance on May 4, 2001, two days after Mr. Atwood injured his wrist.  The timing could not have been worse.  Swire attempted to fix the problem by having Mr. Atwood complete the UNUM LTD enrollment card.  But even then Swire did not get it right.  Mr. Lewis was not aware that evidence of insurability (EOI) was needed for Mr. Atwood.  Mr. Lewis thought Mr. Atwood was covered.  And Mr. Lewis was the Benefits Administrator.

---

[9]The court's conclusion does not require Swire to contact an employee who clearly declines coverage.  This decision only applies to the situation here where Mr. Atwood submitted a confusing and incomplete form indicating election of coverage.

The record does not indicate whether Swire employees were properly trained, but it seems incongruous to pin the problem on Mr. Atwood when Swire's presumably trained Benefits Administrator did not understand the enrollment requirements and Swire's payroll department employees did not properly or timely handle an incomplete enrollment form.  Swire's handling of Mr. Atwood's request for benefits was not competent or prudent.  For this reason, the court finds that Swire breached its fiduciary duty to Mr. Atwood.

Further, Swire's breach denied Mr. Atwood the opportunity to have his application for long term disability benefits decided on the merits.  He was clearly harmed by that (as is demonstrated by UNUM's denial of his application).  Accordingly, he is entitled to an "appropriate equitable remedy" under ERISA § 502(a)(3)(B).

**The remedy Mr. Atwood seeks is an appropriate equitable remedy.**

Mr. Atwood seeks "instatement" in the Plan as of December 26, 2000 (his eligibility date).  He contends that he is entitled to such a remedy under ERISA § 502(a)(3)(B). Swire challenges this proposition, arguing that Mr. Atwood's request is really a request for monetary damages (in the form of LTD benefit payments), which are not available under ERISA. Swire further contends that it is powerless to comply with any order requiring Swire to enroll Mr. Atwood in the Plan because non-party UNUM is the one who enrolls participants.

The court has already resolved the issue about whether Mr. Atwood is truly seeking equitable relief.  In a 2005 Order, the court noted that Mr. Atwood was "'simply requesting that the Court allow the equitable relief of putting the Plaintiff in the position that he would have been in had the Defendant properly enrolled the Plaintiff in its Plan when he was first hired.'" (Oct. 24, 2005 Order (Docket # 38) at 2 (quoting Pl.'s Supplemental Br. in Supp. of Opp'n. to

Defs.' Mot. to Dismiss).)   The court held that Mr. Atwood's request for relief was equitable in nature and therefore available under ERISA § 502(a)(3)(B).

The court re-affirms its earlier holding and re-emphasizes its reliance on Varity Corp. v. Howe, 516 U.S. 489 (1996), and the analogous case of Mathews v. Chevron Corp., 362 F.3d 1172 (9th Cir. 2004).  See also Gorman v. Carpenters' & Millwrights' Health Benefit Trust Fund, 410 F.3d 1194, 1200-01 (10th Cir. 2005) (holding that rescission of subrogation agreement—which restored parties to positions they would have occupied had Fund not acted arbitrarily and capriciously—was appropriate equitable relief under ERISA § 502(a)(3)(B)); Adams v. Cyprus Amax Minerals Co., 149 F.3d 1156, 1161-62 (10th Cir. 1998) (holding that ERISA claim for benefits was inextricably intertwined with equitable relief sought—plaintiffs sought threshold declaration that they were eligible beneficiaries of the plan—and so it was equitable, not legal, in nature).

Swire also contends that the remedy sought would be impossible to provide because UNUM is not a party to this action.  Mr. Atwood is asking that he be enrolled in the Plan as of his eligibility date.  Based on Swire's description of the procedures to enroll an employee, and the Plan documentation, enrolling an employee is Swire's area of responsibility, not UNUM's. What UNUM may do after being informed by Swire that Mr. Atwood is, as a matter of law, deemed enrolled in the Plan as of December 26, 2000, is not for the court to address.  At this point, Mr. Atwood has the right to renew his original LTD claim to the Plan and have it reviewed on the merits.  If it is ultimately determined that Mr. Atwood is disabled and benefits are due to him, it is between Swire and UNUM to determine what course of action to take.

**Mr. Atwood is entitled to attorneys' fees.**

Mr. Atwood also seeks attorneys' fees and costs under 29 U.S.C. § 1132(g), which

provides that "[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary,

the court in its discretion may allow a reasonable attorney's fee and costs of action to either

party." Fees and costs should not be awarded as a matter of course. Rather, the court has

discretion to make the determination. Gordon v. U.S. Steel Corp., 724 F.2d 106, 108 (10th Cir.

1983). In this case, the court does not believe that the Plan should bear any burden of paying

attorney's fees. Accordingly, the determination here applies only to Swire Coca Cola, USA, as

the Plan Administrator.

The Tenth Circuit has identified certain factors that a court should consider when

determining whether attorney's fees and costs should be awarded under ERISA. Those factors

include, but are not limited to:

(1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to personally satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing parties would deter others from acting [similarly] under similar circumstances;

(4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and

(5) the relative merits of the parties' positions.

Gordon, 724 F.2d at 109 (citing Eaves v. Penn, 587 F.2d 453, 465 (10th Cir. 1978)).

There is no evidence of bad faith on the part of Swire. But certainly Swire's culpability

has been established, and that culpability outweighs any that might be attributed to Mr. Atwood.

The court also finds that Swire, a large corporation with thousands of employees, has the ability to satisfy an award of attorney's fees and costs.  As for the third factor, an award of attorney's fees here would deter other plan administrators from so cavalierly treating an employee's benefit application.  The fourth factor is not applicable in this situation, for Mr. Atwood's claim only indirectly benefitted participants and beneficiaries (and no significant legal question was presented to the court).  Finally, the fifth factor certainly weighs in favor of Mr. Atwood, who ultimately prevailed in this court despite Swire's arguments.  Given the court's analysis of the above cited factors, as well as the court's concern that Swire attempted to place the blame completely on Mr. Atwood, the court finds that Mr. Atwood is entitled to reasonable attorney's fees and costs.

Mr. Atwood is directed to file an affidavit and supporting documentation regarding attorney's fees and costs within fifteen days of this Order.  Defendants may file an opposition within fifteen days after they receive Mr. Atwood's submission.

## **ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.      Swire shall "instate" (that is, enroll) Mr. Atwood in the Plan as of December 26, 2000 (his eligibility date).  Swire shall notify UNUM of such enrollment.  Mr. Atwood shall pay LTD insurance premiums (to be calculated by Swire) that should have been deducted from his paycheck for the period of December 26, 2000, to June 9, 2001.  Swire shall collect such premiums and forward those to UNUM.

2.      Swire Coca Cola, USA shall pay Mr. Atwood's reasonable attorney's fees and costs, to be determined by the court after submission of affidavits, supporting documentation,

and briefs, as noted above.

DATED this 19th day of January, 2007.

BY THE COURT:

TENA CAMPBELL
United States District Judge